1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO A. LOPEZ-MARROQUIN,<br><br>                              Petitioner,<br><br>                    vs.<br><br>WILLIAM P. BARR,<br><br>                              Defendant. | CASE NO. 20cv682-LAB (MDD)<br><br>**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Ricardo Lopez-Marroquin filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 requesting release from the Otay Mesa Detention Center where he is being held pending appeal of the denial of his asylum claim.  For the reasons below, the petition is **DISMISSED**.[1]

                                        BACKGROUND

## 1.    Procedural History

Petitioner is a Salvadoran national who has lived in the United States as a permanent resident for more than twenty years.  Certified Administrative Record ("AR") 150-51, 2731. After he suffered multiple criminal convictions in this country, the Department of Homeland

---

[1]  The Court finds this matter suitable for disposition without oral argument or hearing.  *See Yeaman v. United States*, 326 F.2d 293, 294 (9th Cir. 1963) ("When the merits of [a habeas] application can be determined on the record before the court, a hearing is not required nor is the presence of the petitioner necessary.").  In its scheduling order, the Court invited the parties to show that a hearing was necessary, but neither party did so.  *See* Dkt. 3.

1   Security ("DHS") initiated removal proceedings against him in 2012.  AR 2729, 2731.

2   Petitioner then applied for asylum.  In 2018, an immigration judge denied his application and

3   ordered him removed, finding that he was statutorily ineligible for asylum in light of, among

4   other things, his "particularly serious" criminal history, which included convictions for vehicle

5   theft, multiple petty thefts, and driving under the influence.  AR 127-29, 886-89, 891-905.

6         After the Board of Immigration of Appeals ("BIA") denied his administrative appeal,

7   (AR 2-6), Petitioner sought review from the Ninth Circuit, where his case remains pending.

8   On March 30, 2020, he filed an "Emergency Motion" under the All Writs Act, asking the Ninth

9   Circuit to "remand his case to the [BIA] with an order for his immediate release from

10  immigration detention."  Petition, Dkt. 1-2, at 1.  The basis for this emergency request is the

11  COVID-19 pandemic, which Petitioner argues is particularly acute in detention centers like

12  the one where he is currently housed.

13        A panel of the Ninth Circuit—over the dissent of Judge Callahan—construed

14  Petitioner's request as a petition for writ of habeas corpus under 28 U.S.C. § 2241 and

15  remanded it for this Court to consider "expeditiously."  Dkt. 1.

16        **2.     Otay Mesa Detention Center**

17        Petitioner is currently detained at Otay Mesa Detention Center ("OMDC") in Otay

18  Mesa, California.  As of April 15, 2020, there were 25 confirmed cases of COVID-19 at

19  OMDC, of which 18 are ICE detainees and 7 are U.S. Marshal detainees.  *See* Beckhelm

20  Decl., Dkt. 7-1, at ¶ 15.

21        In response to the growing threat posed by COVID-19, OMDC claims to have taken

22  significant steps to prevent and slow the spread of the virus.  Overall, OMDC, which "has a

23  population within approved capacity and is not overcrowded[,] . . . has increased sanitation

24  frequency and provides sanitation supplies," including "disinfectant spray, hand sanitizer,

25  and soap in every housing unit at the jail"; "disinfectants to staff and cleaning crews"; and

26  "hand sanitizer to detainees and staff."  *Id.* at ¶¶ 16-17.  Staff and detainees are encouraged

27  to use the materials provided "often and liberally."  *Id.* at ¶ 17.  Further, housing units are

28  cleaned and disinfected between shifts.  *Id.*  OMDC "has [also] limited professional visits to

1   noncontact visits and suspended in person social visitation and facility tours." *Id.* at ¶ 18.

2   Staff and vendors are screened upon entering the facility, "including [by taking] body

3   temperatures." *Id.* at ¶ 19.   ICE Health Services Corps ("IHSC") medical staff provides

4   facility employees and detainees at OMDC "education on COVID-19," including "the

5   importance of hand washing and hand hygiene, covering coughs with the elbow instead of

6   with hands, and requesting to seek medical care if they feel ill." *Id.* at ¶ 21.

7           Detainees at OMDC are screened upon intake by an IHSC medical provider.  *Id.* at

8   ¶ 10.  As part of that screening, "detainees are assessed for fever and respiratory illness,

9   are asked to confirm if they had close contact with a person with laboratory-confirmed

10   COVID-19 in the past 14 days, and whether they have traveled from area(s) with sustained

11   community transmission in the past two weeks." *Id.* at ¶ 11.  Staff then determine whether

12   to monitor or isolate the detainee, and "detainees who present symptoms compatible with

13   COVID-19 [are] placed in isolation," where they are tested. *Id.* at ¶ 12.  Individuals who test

14   positive "remain isolated and [are] treated," and "[i]n case of any clinical deterioration, . . .

15   referred to a local hospital."  *Id.*   In instances where a detainee is known to have been

16   exposed to an individual with a confirmed case of COVID-19, OMDC follows a procedure

17   known as "cohorting":

18   
19           Cohorting is an infection-prevention strategy which involves
        housing detainees together who were exposed to a person
20        with an infectious organism but are asymptomatic.  This practice lasts
        for the duration of the incubation period of 14 days, because
21        individuals with these and other communicable diseases can be
        contagious before they develop symptoms and can serve as
22        undetected source patients.  Those that show onset of fever
        and/or respiratory illness are referred to a medical provider for
23        evaluation.   Cohorting is discontinued when the 14-day
        incubation period completes with no new cases. Per ICE policy,
24        detainees diagnosed with any communicable disease who
        require isolation are place[d] in an appropriate setting in
25        accordance with CDC or state and local health department
        guidelines.  *Id.* at ¶ 13.
26

27           Unsatisfied with these measures, Petitioner describes OMDC's COVID-19 response

28   as inadequate.  Based largely on a visit by "attorneys and legal staff . . . during the week of

March 19, 2020"—nearly a month ago—Petitioner alleges that the detention center's precautions "fall short of CDC recommendations."  Petition at 7; *see also* Rios Decl. at ¶ 7. On the date of the attorney visit, for example, "no preventative health screening measures of any kind were in place, [and] visitors were not asked whether they had any symptoms of COVID-19, nor was their temperature taken."  *Id.*  More generally, Petitioner alleges that OMDC's medical facilities are "retrograde, understaffed and under-resourced," and he points to a list of detainees who have suffered poor health outcomes (unrelated to COVID-19) as a result of their treatment at OMDC.  Petition at 8.

### 3. Petitioner's Personal Circumstances

Petitioner is a 39-year-old male.  He suffers from "severe mental health challenges including schizophrenia and bipolar disorder," (Petition at 14), but otherwise does not allege any underlying health conditions that would put him at an increased risk from COVID-19.

On April 10, the Court expressed concerns about ordering the release of a detainee without a suitable release plan in place, and it ordered Petitioner to submit a declaration describing how he planned to proceed if released.  In response, he states that, if released, he will initially reside with his father, Ricardo Lopez Sr., in Los Angeles.  *See* Chertoff Decl., Dkt. 4, at ¶ 3.  He will be transported to Los Angeles by a close family friend, Fabricio Mejia. *Id.* at ¶ 4.  Due to space constraints, the family is seeking to rent a room for Petitioner at the home of a close family friend.  *Id.* at ¶ 5.  Petitioner's sister and his counsel will check on him regularly and ensure he has access to any needed mental health treatment.  *Id.* at ¶¶ 6, 7.

## ANALYSIS

To succeed on a habeas petition, a petitioner must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241. Because Petitioner has failed to exhaust his administrative remedies and because his custody does not violate federal law, the Court concludes that his petition must be dismissed.

/ / /

**1.      Petitioner Has Failed to Exhaust Administrative Remedies**

The Ninth Circuit "require[s], as a prudential matter, that habeas petitioners exhaust available judicial and administrative remedies before seeking relief under § 2241." *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006); *see also Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 819 (9th Cir. 2003) (a "petitioner must exhaust administrative remedies before raising the constitutional claims in a habeas petition when those claims are reviewable by the BIA on appeal"). Specifically:

> Courts may require prudential exhaustion if (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). "[P]rudential limits, like jurisdictional limits and limits on venue, are ordinarily not optional." *Id.* (quoting *Castro-Cortez*, 239 F.3d at 1047).

Petitioner sought bond hearings in July and December 2017, but his counsel withdrew requests for a hearing on both occasions. *See* Respondent's Supplemental Brief ("Supp. Br."), Dkt. 7, Ex. A at ¶ 24. There is no indication in his petition that he has recently requested a bond hearing, which would be required to exhaust his administrative remedies in this context. *See Franco-Gonzalez v. Holder*, 2013 WL 3674492, *10-14 (C.D. Cal. 2013) (describing the bond process under the INA).

Applied here, the *Puga* factors weigh in favor of requiring exhaustion. As Respondent points out, in light of Petitioner's mental health concerns, the agency would be in a better position to evaluate whether release is appropriate, "especially in consideration of [Petitioner's] daily needs, his ability to care for himself, persons able to assist him, and current community pandemic concerns." Supp. Br., at 10. Further, relaxation of the requirement here would encourage "deliberate bypass of the administrative scheme" by

1  opening up habeas review to all detainees, regardless of their underlying heath conditions

2  or whether they are uniquely susceptible to COVID-19.  Finally, administrative review would

3  likely allow the agency to correct its own mistakes and preclude the need for judicial review.

4  This conclusion is not merely hypothetical—it is supported by the fact that the agency has

5  released (and continues to release) detainees from custody who are at heightened risk from

6  COVID-19, which counsels against the Court providing an end-around for detainees seeking

7  to bypass that administrative system.  *See, e.g., Sagastume v. Archambeault*, 20cv658-LAB

8  (S.D. Cal.), Dkt. 26 at ¶ 5 (voluntary dismissal of a petition for writ of habeas corpus following

9  the release from Otay Mesa of a petitioner with underlying health conditions).

10  Other courts considering habeas challenges in recent weeks have found that the

11  COVID-19 pandemic presents an exigency that excuses the exhaustion requirement.  *See,*

12  *e.g., Doe v. Barr*, 2020 WL 1820667, at *8 (N.D. Cal. 2020); *Perez v. Wolf*, 2020 WL

13  1865303, at *6 (N.D. Cal. 2020).  To be sure, a petitioner need not exhaust administrative

14  remedies where those remedies "are inadequate or not efficacious, pursuit of administrative

15  remedies would be a futile gesture, irreparable injury will result, or the administrative

16  proceedings would be void."  *S.E.C. v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 n.4 (9th

17  Cir. 1981).  Given the amount of time needed to complete a BIA appeal, detainees with

18  underlying health conditions may suffer "irreparable injury" if forced to pursue an

19  administrative appeal before resorting to habeas relief.  But, for reasons discussed in more

20  detail below, Petitioner would not.  Nothing in his petition indicates that he is at greater risk

21  of contracting, or suffering complications from, COVID-19 than the average detainee.

22  Because Petitioner has failed to exhaust administrative remedies—and nothing in his

23  petition suggests he is excused from doing so—his petition must be dismissed.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

- 6 -

1

2.      **Petitioner's Detention is Lawful**

2      Respondent next argues that even if Petitioner were excused from exhausting

3    administrative remedies, his petition must be dismissed because his detention is lawful.[2]

4    The Court agrees.

5      When the government detains a person pursuant to an immigration violation, the

6    person is considered a civil detainee.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

7    To evaluate the constitutionality of a civil detention condition under the Fifth Amendment, a

8    district court must determine whether those conditions "amount to punishment of the

9    detainee."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, ---

10    U.S. ---, 135 S. Ct. 2466, 2473-74 (2015).  Punishment may be shown by an express intent

11    to punish or by a restriction or condition that "is not reasonably related to a legitimate

12    governmental objective."  *Bell*, 441 U.S. at 539; *see also Kingsley*, 135 S. Ct. at 2473-74

13    (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the

14    challenged governmental action is not rationally related to a legitimate governmental

15    objective or that it is excessive in relation to that purpose").  In addition, "when the State

16    takes a person into its custody and holds him there against his will, the Constitution imposes

17    upon it a corresponding duty to assume some responsibility for his safety and general well-

18    being."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 199-200 (1989).

19    The government violates the Due Process Clause, for example, if it fails to provide civil

20    detainees with "food, clothing, shelter, medical care, and reasonable safety."  *Id.* at 200.  In

21    the context of a Due Process Clause failure-to-protect claim, the Ninth Circuit has made

22    clear that "the defendant's conduct must be objectively unreasonable, a test that will

23    necessarily 'turn on the facts and circumstances of each particular case.'"  *Castro v. Cty. of*

24    *L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley*, 135 S. Ct. at 2473) (alterations

25    and internal quotation marks omitted).

26    _____

27    [2] Respondent also argues that a habeas petition is an improper vehicle to raise a "conditions of confinement" claim.  The Court rejects this argument for the reasons set out in *Habibi v.*

28    *Barr*, WL 1864642, at *2 n.2 (S.D. Cal. 2020)

1    Here, Petitioner hasn't alleged or presented evidence that the government acted with

2   an "express intent" to punish him.  Nor does he dispute that preventing detained aliens from

3   absconding and ensuring that they appear for removal proceedings is a legitimate

4   governmental objective.  *See Jennings v. Rodriguez*, --- U.S. ---, 138 S. Ct. 830, 836 (2018);

5   *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas*, 533 U.S. at 690-91.  He may

6   therefore succeed on his Fifth Amendment claim only if his confinement is excessive in

7   relation to the legitimate governmental objective, *see Kingsley*, 135 S. Ct. at 2473-74, or if

8   Respondent fails to reasonably provide for Petitioner's safety.  *See DeShaney*, 489 U.S. at

9   200.  Because these two questions bleed over in this context, the Court considers them

10   together.

11    First, under normal circumstances, Petitioner's detention is certainly reasonable.  The

12   Supreme Court has recognized that the detention of individuals pending removal

13   proceedings is rationally related to the legitimate governmental interest of ensuring their

14   appearance for their deportation proceedings and preventing danger to the

15   community.  *See Zadvydas*, 533 U.S. at 690.  This is especially true in the Petitioner's case

16   because he has a "lengthy criminal history in the United States and a history of failing to

17   appear for his scheduled court hearings."  *See* Supp. Br. at 3; *see also* Supp. Br., Ex. C.

18   (Petitioner's FBI Rap Sheet).  Indeed, because of Petitioner's status as a felon, Respondent

19   is prohibited by statute from releasing him unless the release is "necessary" for witness-

20   protection purposes and Petitioner demonstrates that he will "not pose a danger to the safety

21   of other persons or of property and is likely to appear for any scheduled proceeding."

22   8 U.S.C. § 1226(c)(2).

23    The question, then, is whether the COVID-19 public health crisis alters this calculus.

24   In the Court's judgment, it doesn't.  On the evidence presented, Petitioner's confinement is

25   not "excessive" because he does not suffer from any health conditions that put him at an

26   increased risk of severe illness or death as a result of contracting COVID-19.  While the

27   Court acknowledges that Petitioner suffers from schizophrenia and bipolar disorder—and

28   these mental disorders may make his subjective experience of detention more unpleasant—

1   Petitioner hasn't alleged or offered evidence that these mental illnesses make him *more*

2   susceptible to COVID-19 or would increase the severity of his illness if he were to contract

3   the virus.  By all accounts, Petitioner is a physically healthy, 39-year-old man who meets

4   none of the COVID-19 risk factors set out by the Centers for Disease Control.  *See* "Groups

5   at Higher Risk for Severe Illness," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-

6   extra-precautions/groups-at-higher-risk.html (April 15, 2020) (identifying those at highest

7   risk of suffering from severe and possibly fatal forms of the disease to include the elderly

8   (people ages 65 and older) and people with certain conditions, including chronic lung

9   disease or moderate to severe asthma; serious heart conditions; severe obesity; diabetes;

10  chronic kidney disease; liver disease; and those who are immunocompromised from

11  conditions such as chemotherapy, smoking, transplants, HIV/AIDs, or the use of immune

12  weakening medications).

13       Nor has Petitioner demonstrated that his "condition of confinement [at OMDC] is sure

14  or very likely to cause serious illness and needless suffering" for the typical inmate without

15  underlying health problems.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Even in the best

16  of times, "[r]unning a prison is an inordinately difficult undertaking that requires expertise,

17  planning, and the commitment of resources . . . . Prison administration is, moreover, a task

18  that has been committed to the responsibility of [the legislative and executive] branches,

19  and separation of powers concerns counsel a policy of judicial restraint."  *Turner v. Safley*,

20  482 U.S. 78, 84–85 (1987).  According to Respondent, the administration at OMDC has

21  taken extensive measures to prevent and limit the spread of COVID-19.  Among other

22  things, the facility has halted social visitations and increased the frequency of cleanings,

23  with each housing unit being cleaned and disinfected between shifts.  *See* Beckhelm Decl.

24  at ¶¶ 17-18.  Medical providers screen new detainees upon admission, and those who

25  "present symptoms compatible with COVID-19 [are] placed in isolation."  *Id.* at ¶ 12.  For

26  detainees who are exposed to someone with COVID-19, OMDC uses the process of

27  "cohorting," in which all detainees who were similarly exposed are housed together for a

28  minimum of 14 days and are tested daily.  *Id.* at ¶ 13.  Although Petitioner alleges that

1  OMDC's procedures are "inadequate" and that more could be done,[3] this, of course, is

2  always the case.  *See* Reply, Dkt. 1-4, at 7.  What Petitioner has failed to demonstrate is

3  that Respondent's actions are "objectively unreasonable," which is the required standard.

4  *See Kingsley*, 135 S. Ct. at 2473.

5        Paradoxically to Petitioner's arguments, his mental health issues may in fact counsel

6  *in favor* of continuing his detention during the COVID-19 pandemic.  The appellate record

7  reflects that he "lacks insight about his mental illness and his mental-health needs."  AR

8  803.  Petitioner even acknowledges that doctors have told him he needs medication, but he

9  does not understand the purpose and impact of his medication, (AR 801), and he cannot

10  reliably administer his own mental health care.  AR 457:17-22.  Therefore, unlike in other

11  cases where courts have found that a petitioner would be better able to protect themselves

12  from COVID-19 in their own homes, the Court finds that Petitioner's health would be better

13  protected in detention than outside of it.

14        In sum, the Court does not find that Petitioner's detention is constitutionally deficient,

15  especially absent any health conditions that set him apart from the detained population as

16  a whole.  As Judge Callahan noted in dissent from the Ninth Circuit's Order, "Lopez is a

17  generic detainee, in that he claims neither to have contracted the virus nor to suffer from

18  any underlying health issues placing him at greater risk than anyone else in Government

19  custody.  Lopez's motion, then, is really just the camel's nose under the tent.  If he's entitled

20  to relief, then who isn't?"  Dkt. 1 at 4.  The Court agrees with Judge Callahan's observations,

21  and finds that Petitioner's continued detention violates neither "the Constitution or laws or

22  treaties of the United States."  28 U.S.C. § 2241.

23  / / /

24

---

25  [3] Again, many of Petitioner's allegations of improper practices at OMDC are based on a visit
26  made to the facility nearly one month ago.  *See* Petition at 7 ("Attorneys and legal staff
   visiting Otay Mesa during the week of March 19, 2020 have reported COVID-19 precautions
27  at the facility that falls short of CDC recommendations.").  In contrast to the substantial
   evidence Respondents have put forward regarding the precautions that are now being
28  taken, this has little probative value regarding the risk of future harm to inmates.

**CONCLUSION**

Because Petitioner has not shown that he is entitled to habeas relief, his petition is **DISMISSED**.  The clerk is directed to enter judgment accordingly.

Respondent's motion to lodge Petitioner's medical records under seal, (Dkt. 8), is **GRANTED**.  *See Heldt v. Guardian Life Ins. Co. of Am.*, 2018 WL 5920029, at *2 (S.D. Cal. 2018) ("Documents containing specific medical information may be filed under seal." . . . "The need to protect medical privacy qualifies as a 'compelling reason' to seal documents").

**IT IS SO ORDERED**.

Dated: April 17, 2020

_____
**HONORABLE LARRY ALAN BURNS**
Chief United States District Judge